MOSES JACOBS, Administrator of the estate of LEAH JACOBS, Deceased, and MOSES JACOBS, Intervenor, v. CHARLES JACOBS, and MARY JACOBS, Appellants.

**Accord and satisfaction:** EVIDENCE. Where it appeared that a son
1   had turned over to his mother all of his earnings both prior and subsequent to his majority, and upon entering business for himself a portion of the fund was repaid to him without an accounting or a severance of the family relations, such

payment is held not to constitute a satisfaction of his interest in the fund.

**Infant's emancipation:** EVIDENCE. Where a minor son engaged in business on his own account and turned over to his mother, with his father's knowledge and assent, all of his earnings and the same were invested in the mother's name, but treated by all as the property of the son, there was an emancipation of the son by the father, and he was not entitled to the fund as against the son.

**Evidence:** DECLARATIONS OF DECEASED PERSON. Where the administrator of his mother's estate brought suit to recover certain funds, transferred without consideration by her to his father, and himself intervened, claiming that the same belonged to him, but was held in trust by his mother, his brothers and sisters were competent to testify to statements made by the mother to third persons that she held such funds in trust for the intervener.

**Disposal of trust fund:** RECOVERY. Where a son turns over to his mother all of his earnings under an implied agreement that she shall keep and ultimately return the fund to him, the same becomes a trust fund and a transfer thereof to the father without consideration passes no interest therein, either to him or his assignee.

**Inconsistent remedies.** Where an administrator brought suit to recover property as belonging to the estate and subsequently intervened claiming the same as his own, there was no such inconsistency of remedies as to preclude a recovery on the petition of intervention, the court having dismissed the suit brought in the name of the administrator and there being no other claimants to the fund.

**Trust fund:** MEASURE OF RECOVERY. The measure of recovery against an assignee of a trust fund is limited to the amount shown to have been received by the assignee, and is not to be determined by the amount of the original fund.

**Taxation of costs.** No portion of the costs of a trial should be taxed to an intervener who is successful on all the issues of his petition.

*Appeal from Polk District Court.*— HON. A. H. McVEY, Judge.

WEDNESDAY, JULY 12, 1905.

REHEARING DENIED FEBRUARY 21, 1906.

ACTION orginally instituted by plaintiff, as adminis-
trator of the estate of his deceased mother, for the discovery
of assets of her estate, converted by defendants, who are his
father and his father's present wife, to their use, and to have
set aside assignments and conveyances made by the mother
prior to her death, and for the appointment of a receiver for
such property. Subsequently the administrator, who had
filed a claim in probate against the estate of his mother,
intervened in this action in his own name, alleging that the
property transferred by his mother to these defendants be-
longed to him, and was held in trust by her for him, and
asking that his right thereto be established as against de-
fendants. The trial court dismissed the petition of plain-
tiff as administrator, but sustained his claim as intervener,
and gave judgment in his favor against defendant Charles
Jacobs for $10,000 and against Mary Jacobs for $2,700,
and appointed a receiver for the property transferred by
Leah Jacobs to the defendant Charles Jacobs, with the
further provision that the value of any property recovered
from Mary Jacobs be credited on the judgment of $10,000
against Charles Jacobs. All parties appeal, but defend-
ants, having first appealed, will be treated as appellants.
— *Affirmed.*

*Read & Read,* for appellants.

*Bowen, Brockett & Welday,* for appellee.

McCLAIN, J.— The defendant Charles Jacobs and his
wife, Leah Jacobs, came to America from Russia, in 1865,
and in 1869 removed from Rochester, N. Y., to Des Moines.
Prior to this removal he had been engaged in the business
of peddling, and after coming to Des Moines he continued
for some years to engage in that business. At the time of
the removal to Des Moines there were three children, Han-
nah, Isaac, and Moses. Within a few years another daugh-

ter and another son were born, and all of these children remained at home with their parents until they arrived at or near majority. Moses, however, continued to reside with his parents until his marriage in June, 1901, when he was 32 years of age. The three sons successively, on reaching the ages of from six to nine years, engaged in the business of selling newspapers in Des Moines. Isaac continued in that business, with an interval when he was a newsboy on railroad trains, until he was about 18 years of age, when he was apprenticed to the jeweler's business, and subsequently removed to another place, engaging there in that business for himself. Louis, the youngest, accumulated some money of his own during his minority, although, as it appears, with some protest from his parents, and also left home before his majority, and engaged in business for himself. But all three of the boys at first brought home the money realized from the sale of papers, and gave it to their mother, with their father's assent, and in this way a considerable fund was accumulated, which was loaned out in the mother's name, the business, however, being transacted to some extent, at least, by the father. We are satisfied from the evidence that the father contributed but little, if anything, to the accumulation of this fund, which, as the formal transactions would indicate, was regarded as being within the custody and control of the mother.

For at least twenty years prior to the death of the mother the father had not been engaged in any employment yielding pecuniary returns, although he had assisted his wife in running the house, and had to some extent aided the boys in carrying on the business of selling newspapers. Moses was, without question, the most active and successful of the three boys in selling newspapers, and as he attained maturity he derived a large income from the business, amounting in some years to a net sum of not less than $2,500 a year, and all the money which he received as well after his

majority up to the time of his marriage as during his minority he turned over to his mother, who from week to week furnished him the sums necessary to pay his bills for papers, as already stated. He lived with his parents, and it appears that his clothing was provided by them. Not long before his marriage Moses insisted to his father and mother that he should have some of the accumulated money, and $15,000 was turned over to him, substantially without protest, save that his father objected to his having more than $10,000 at that time, with the suggestion that he should have $5,000 later. The sum of $15,000 thus received was deposited in a bank in the name of Moses, but the certificate of deposit was retained by his parents until he married and went in business for himself, when it was surrendered to him. At the time this sum of money was surrendered to Moses, his mother had remaining in her possession in money and securities a considerable fund, the amount of which is left quite uncertain under the evidence; but during her last illness in 1901, at her husband's request, she conveyed to him the homestead, and assigned to him securities to the value of more than $10,000. About six weeks after her death her husband was married to his present wife, and converted some of the notes which he held by assignment into other securities taken in her name.

I. It is claimed that the $15,000 paid to Moses was so paid and accepted by him in full satisfaction of any claim which he might have on the funds in his mother's hands, but, after reviewing the evidence, we are satis-

1. ACCORD AND
SATISFACTION: fied to state the conclusion that there was no
evidence. intention on either side to make any final settlement or adjustment as to the extent of his right to the funds in his mother's hands. Neither Moses nor his parents seem to have regarded the payment as terminating his relations as a member of the family or as interested in the funds. We are well satisfied that, if there had been a full accounting and settlement, some more definite evidence thereof

would have been produced than is to be found in this record. Moses was at this time anticipating marriage and the establishment of a place of business, and seems to have thought that it was time to have some money in his own name, and no serious objection was made as to his right to insist on the amount which he demanded, which amount seems to have been proposed by him without any knowledge or means of knowledge as to how much money his mother had, or the amount which may have been contributed to the funds in her hands by other members of the family.

II.   Counsel on each side discuss the question of emancipation, it being contended on one hand that Moses was emancipated when he was first allowed to engage in the sale of newspapers on his own responsibility, and 2. INFANT'S EMANCIPATION: on the other that he was not emancipated when evidence. he attained his majority, but as he continued a member of the family, and paid over his earnings to his mother, these earnings were the property of his parents.   In reaching a conclusion as to emancipation it is important to bear in mind that Moses' earnings from the first were not turned over to his father, who had a right to them, but to his mother, with his father's assent; and it is established beyond controversy in the evidence that the funds thus received by his mother from him were repeatedly referred to by both parents as belonging to Moses.   Declarations to this effect were made when the money was loaned in the name of the mother, and during the latter years of her life Moses on some occasions transacted the business for her and in her name.   These declarations show in a general way that the greater part of the fund was regarded as having been contributed by Moses, and there is no question but that his contributions to this fund after deducting the $15,000 received by him, exceeded the amount which was finally transferred by his mother to his father during her last illness.

If these earnings had from the first been delivered to the father, who was entitled to them, and controlled by him,

there would be more force in the argument that there was no emancipation, at least prior to majority; but even so far as the father assisted in carrying on the business of selling papers, such assistance was rendered simply in a subordinate capacity, and alike to Moses and the other two sons. Moses was allowed to manage his business in his own name, and although, as already indicated, he paid over the money received by him from day to day to his mother, and obtained from her the money necessary to pay his bills, yet from all the circumstances we cannot avoid the conclusion that the father, who was entitled to Moses' earnings, voluntarily surrendered his right thereto, and assented that such earnings be accumulated by the mother, and held by her for the benefit of her son; and this, we think, was sufficient to constitute emancipation. *Dierker v. Hess,* 54 Mo. 246; *Everett v. Sherfey,* 1 Iowa, 357; *Bener v. Edgington,* 76 Iowa, 105; *Crary v. Hoffman,* 115 Iowa, 332; *Bristor v. Chicago & N. W. R. Co.,* 128 Iowa, 479. While none of the cases cited by counsel are particularly pertinent to the facts of the case before us, we have no difficulty in reaching the conclusion that Charles Jacobs relinquished his right to the earnings of Moses, and cannot now assert any claim to the funds derived by him from his wife on the ground that such funds were the result of the earnings of Moses before emancipation.

III.   Some question is made as to the competency of the testimony of the other children, all of whom were called as witnesses in behalf of plaintiff and intervener, with reference to declarations of the mother as to the funds accumulated by her being held for Moses. But such witnesses were certainly competent to testify as to declarations made in their presence to others, although they may have been possibly interested as heirs of their mother in the result of the action brought by the administrator to recover the funds transferred by her to her husband prior to her death. It is only as to personal

3. EVIDENCE: declaration of deceased person.

transactions and communications between persons who are interested and the deceased that the testimony is rendered incompetent by Code, section 4604. These heirs were not parties to nor interested in the issues arising on the petition of intervention by Moses in his own name and right. The sole relief granted was against the defendants on this petition of intervention, and we see no necessity for the further discussion of the question of competency.

IV. Having reached the conclusion on the evidence that Leah Jacobs had in her hands a sum of money which both she and her husband recognized as a trust fund, we have no serious difficulty in sustaining the decree of the trial judge. As before indicated, Charles Jacobs has not within the past twenty years contributed anything to the fund held in his wife's name. As to contributions by Isaac and Louis, it is enough to say that they are not asserting any claim to the fund. Even if they have contributed thereto, intervener should not be denied relief in the amount of the fund turned over by Leah Jacobs to her husband without consideration, if it amounts to no more than intervener has contributed. We are satisfied that the amount of his contribution more than equals the amount of the fund thus turned over. And here it may be suggested that there is no occasion for a discussion of resulting or constructive trusts. If the evidence shows that Leah Jacobs received the money of her son Moses under an implied agreement to keep it for him and ultimately return it to him, then all moneys thus received by her from him constituted a trust fund in her hands, to which her husband could acquire no right by transfer of the securities without consideration, and the husband took the securities with an obligation to account for them to their real owner. The present wife, so far as proceeds of securities have been put in her name, holds such proceeds under like obligation. The doctrine of trusts is argued with reference to the homestead, as to which it would, of course, be pertinent, but as the

4. DISPOSAL OF TRUST FUND: recovery.

intervener now makes no claim to the homestead we need not give the matter further consideration.

.V.   It is contended that the remedy asked by intervener in his own name is inconsistent with the remedy asked in the action as originally brought by him as administrator. But we do not see that there is any such inconsistency as to make it improper to give the relief granted in the lower court on his petition of intervention.   As the lower court dismissed the petition brought in the name of the administrator and granted relief only on the petition of intervention, no wrong was done so far as the defendants are concerned.   If it appeared that Moses Jacobs was entitled in his own right to the fund turned over to his father, it was certainly competent for the court to adjust the controversy under the issues raised on the petition of intervention so long as no other claimant to the fund was asking relief.

5. INCONSISTENT REMEDIES.

VI.   On the cross-appeal it is argued for intervener that he was entitled to a larger judgment, and we think it may be conceded that the evidence tends to show that the contribution made by Moses Jacobs to the funds in his mother's hands exceeded the aggregate of $25,000, which he has secured to him from the payment by his mother of $15,000 and the judgment against his father for $10,000; but no specific objection is made to the finding of the court as to .the amount of the securities transferred to his father by his mother, or as to the propriety of the credits given to the father out of the fund represented by such securities, and the intervener was entitled to judgment against ·his father only to the extent of the securities received by him in excess of the expenditures which the court recognized as proper.   The decree is based evidently not on what Moses Jacobs contributed to the fund in his mother's hands, but on the showing as to the amount of the fund received by the father.   The same considerations are applicable to the complaint in behalf of the administrator as to

6. TRUST FUND: measure of recovery.

the dismissal of his original petition. It does not appear that the defendants have funds in their hands, aside from those disposed of by the decree, for which they should account to the estate.

Complaint is further made on behalf of intervener as to the taxation of costs. The decree provides that one-third of the entire costs in the whole proceeding be taxed to defend-
7. TAXATION OF COSTS. ants, one-third to intervener, and one-third to the administrator. We do not understand on what theory any portion of the costs were taxed against intervener. As to no issue raised in his petition of intervention was he unsuccessful, save as to the conveyance of the homestead, which he sought to have set aside. But as no costs seem to have been incurred with reference to this branch of the case which were not necessary in the trial of the issues as to the personal securities, we think it would have been equitable to assess the entire costs, so far as the issues of the intervention were concerned, to the defendants. There was no impropriety in taxing a portion of the costs to the administrator, whose petition for relief was practically abandoned during the course of the trial.

The result is that two-thirds of the costs in the lower court are taxed to defendants and one-third to the administrator as plaintiff in the original action, and that the cost of this appeal are taxed to the appellants. Otherwise the decree of the trial court is *affirmed*.